**Harold R. JONES,**
**Plaintiff-Appellant/Cross-Appellee,**

v.

**BENDER WELDING & MACHINE WORKS, INC. and Caterpillar Tractor Co., Defendants-Appellees/Cross-Appellants.**

**Nos. 76–2684, 76–2114.**

United States Court of Appeals,
Ninth Circuit.

Aug. 10, 1978.

As Amended on Denial of Rehearing
·Sept. 12, 1978.

Andrew C. Gauen (argued), of Merrick, Hofstedt & Lindsey, Seattle, Wash., for plaintiff-appellant/cross-appellee.

Douglas M. Fryer (argued), of Moriarty, Long, Mikkelborg & Broz, Seattle, Wash., for defendants-appellees/cross-appellants.

Before DUNIWAY, CUMMINGS,* and SNEED, Circuit Judges.

---

* The Honorable Walter J. Cummings of the United States Court of Appeals for the Seventh Circuit is sitting by designation.

1. The findings of fact were drafted originally by plaintiff's counsel in response to the judge's

---

CUMMINGS, Circuit Judge.

In this admiralty and diversity suit brought under 28 U.S.C. §§ 1332 and 1333, plaintiff, a citizen of Alaska, sued Bender Welding & Machine Works, Inc., an Alabama corporation with its principal place of business in Mobile, and Caterpillar Tractor Company, a Delaware corporation, with its principal place of business in Peoria, Illinois, for damages to plaintiff's fishing vessel MARCY J and other consequential damages. In June 1972, plaintiff bought the MARCY J, an 86-foot steel fishing vessel, from Bender for $278,499.30. The ship's main engine was manufactured by Caterpillar in December 1970. According to the complaint, the MARCY J's oil cooler supply line fractured three times in April and May 1973. The essence of the claim against the manufacturer was that the oil cooler supply line was improperly designed and that dealers were not properly advised on how to repair the line; the line did not have a bracket and therefore was subject to movement and pressure that encouraged fractures such as the one suffered by plaintiff's MARCY J. Because of Caterpillar's allegedly defective design and negligence and because of Bender's alleged breach of warranty and negligence, plaintiff sought $160,673.60 from the defendants.

Pursuant to the contract of sale between Jones and Bender, their dispute was referred to arbitrators whose award was in favor of Bender "for unspecified reasons" (R. 8.1). Therefore, the district court dismissed the present complaint as against Bender.

The two-day bench trial of the claims against Caterpillar led the district judge to adopt the following findings of fact:[1]

The engine on the MARCY J was manufactured by Caterpillar and shipped to its authorized dealer, Mustang Tractor & Equipment Company in Houston, Texas, in December 1970. Mustang adapted the en-

letter of March 3, 1976. That letter also outlined the judge's reasons for decision, which are discussed herein together with his conclusions of law.

gine for marine use and installed it in the shrimp trawler RANEY GRASSO, later rechristened the MARCY J. Bender purchased the vessel in 1972 and in June of that year plaintiff bought it from Bender for $278,499.30. After converting the vessel into an Alaskan shrimp and crab fishing-boat, Bender delivered the MARCY J to Jones in March 1973.

Plaintiff left Bender's shop in Mobile, Alabama, on April 7, 1973, aboard the MARCY J bound for Puget Sound, Washington. Jones was planning to operate the vessel in the crab and shrimp industry out of Kodiak, Alaska.

On April 19, 1973, a Caterpillar dealer boarded the MARCY J in Balboa, Canal Zone, for engine work. At that time he noted a small crack in the oil cooler supply line but did not have the part in stock and could not obtain it "in a timely fashion due to local [Easter] holidays" (R. 111). Therefore, Jones, with the assistance of a workshop on a nearby vessel, brazed the crack. The MARCY J sailed on April 20 and no more leakage occurred during the next several days.

While the MARCY J traveled north on April 22, 1973, a hose connected to its oil pressure alarm system cracked. Emergency repairs failed on the following day and the cracked hose was removed; as a result the oil pressure alarm system became inoperative. In addition to that alarm system, the MARCY J had another oil level alarm system known as a Murphy switchgage. The Murphy switchgage was neither manufactured nor installed by defendant Caterpillar. This switchgage was inoperative during the entire voyage.[2]

On April 24, the day after the attempted repair,[3] the MARCY J was disabled off the coast of Guatemala after the oil cooler supply line cracked in the same place that had been repaired in the Canal Zone. Consequently, plaintiff had the MARCY J towed to San Diego, California,[4] arriving there on May 7, 1973. In San Diego an authorized Caterpillar dealer undertook diesel engine repairs on the MARCY J from May 8 to 27, including the installation of a new unbracketed oil cooler supply line.

While the MARCY J was at sea off the coast of California on May 31, 1973, it again became disabled due to engine failure caused by the cracking of the new oil cooler supply line in the same place as previously. Because the MARCY J's oil pressure alarm system had been repaired in San Diego, the plaintiff was warned of impending engine problems in time to shut off the engine on May 31, so that the engine did not suffer serious damage. During the ensuing tow to Fort Bragg, California, for repairs, including installing a makeshift bracket for the oil cooler supply line, by a Caterpillar dealer, the Coast Guard ordered the MARCY J to raise its outriggers because of the narrow entrance to that harbor. Due to the rough weather, these poles were damaged. The vessel departed from Fort Bragg on June 3 and finally arrived in Seattle on June 7, 1973, where further engine repairs, including a Caterpillar bracket for the oil cooler supply line, were accomplished by a Caterpillar dealer and another concern.

The MARCY J left Seattle on July 12 and arrived in Kodiak, Alaska, on July 19, where she has been engaged in the crab and shrimp fishery business since July 28.

**2.** Although the district court made no finding of fact on the issue, the record indicates that there was no way for Jones to discover this malfunction at sea (R.T. 214) and apparently he was unaware of it. Although the face of the system's gauge had been painted over (R.T. 37–38), Bender had advised Jones that the MARCY J had such a system (R.T. 88). (R.T. stands for Reporter's Transcript.)

**3.** The trial judge referred to April 23, but that finding is contradicted by the record and by the briefs (see e. g., R.T. 29, 89; Def. Br. 9), as well

as by his own conclusion of law that the engine failed on April 19, 24, and May 31.

**4.** In commenting on plaintiff's decision to tow all the way to San Diego, defendant cites plaintiff's statements that he did not speak Spanish, that "the coast line and that country is so primitive along there that they are still barefoot and living in dirt-floored shacks (R.T. 91), and that replacement parts might have to arrive by oxcart" (R.T. 92) (Br. 9–10).

The district court found that the foregoing casualties were "the direct result of a failure of the [Caterpillar] oil cooler supply line" (R. 113) and were not caused by the failure of the oil alarm hose [on the MARCY J] and/or the Murphy switchgage (R. 115). Failure reports and warranty claims about the oil cooler supply line had previously been received by Caterpillar, which was found negligent for failing to design a longer-lived oil cooler supply line and for failure to advise dealers to add a bracket assembly (manufactured by Caterpillar) to the oil cooler supply line or to retrofit a bracket to existing engines. Judge McGovern found that plaintiff's oil cooler supply line failed on April 19, 24 and May 31, 1973, as a direct result of Caterpillar's negligence, forcing plaintiff to pay $39,030.22 for engine repairs, towing[5] and repairs to MARCY J's outriggers.[6] Concluding that its jurisdiction was based on diversity and not admiralty, the court refused to accept plaintiff's $107,000 claim for lost profits because they assertedly were barred by the law of the applicable state.[7]

The court also found that the damages were not caused by plaintiff's contributory negligence and that the failures of the oil alarm system and the Murphy switchgage were not due to his negligence and were not the proximate cause of the damages.

Caterpillar has appealed from the $39,-030.22 (plus 8% interest) judgment entered against it, and plaintiff has cross-appealed on the ground that the district court had admiralty jurisdiction and should have awarded him $107,000 for lost profits. We affirm with respect to Caterpillar's appeal and reverse and remand with respect to Jones' cross-appeal.

**5.** The court cited *Baumgardner v. American Motors Corporation*, 83 Wash.2d 751, 522 P.2d 829 (1974), for the proposition that the towage expenses were "an enhanced injury which proximately and foreseeably resulted from the failure of the engine itself."

**6.** The damages were broken down as follows:

Engine Repairs:
Panama                          $  106.50

## I. Liability for Negligence

Plaintiff concedes that "the case is one purely of negligence" (Br. 13) because he has not attacked the trial court's dismissal of any strict liability claims as not being properly raised by the pleadings. The basis of the claim of liability centers on the fact that although Caterpillar designed the oil cooler supply line to last the life of the engine under normal use, plaintiff's line failed three times because it was not supported by a bracket. Once even a makeshift bracket was installed in June 1973, no more problems occurred.

Caterpillar's initial challenge to the judgment below is that the district court erred in finding negligence liability on this claim. It argues first that the evidence was insufficient to support the finding that it was negligent, alternatively that its negligence was not the proximate cause of plaintiff's damages, and finally that plaintiff should be deemed contributorily negligent.

### A. Caterpillar's Negligence

In seeking to establish Caterpillar's negligence, plaintiff relies on three alternate theories: that Caterpillar was negligent in its design of the oil cooler supply line, that it negligently analyzed warranty and similar claims, and that it was negligent in failing to give sufficient advice to its dealers of the bracket assembly change. Without implying the inadequacy of the first two theories, in affirming the finding of negligence we focus on the third theory because it is sufficient itself to justify liability for negligence.

The evidence showed that after Caterpillar was advised in 1970 of the problem with the line by one service engineer, a different

| | |
|---|---|
| San Diego | $14,221.67 |
| Fort Bragg | 373.16 |
| Seattle | 150.00 |
| Salvage Towage: | |
| Guatemala to San Diego | 20,749.50 |
| Outrigger repairs | 3,429.39 |
| | $39,030.22 |

**7.** The court cited *Berg v. General Motors Corporation*, 13 Wash.App. 326, 534 P.2d 838 (1975), for this proposition.

engineer, Milford Morgan, designed a support bracket that was described as change no. 4 to the oil lines group. Change no. 4 was dated October 29, 1970, and given an urgent classification. It was designed to apply to earlier engines, and Morgan specifically advised Caterpillar's Service Engineering Department that it was possible to retrofit the change to earlier engines.

Nonetheless, apparently the Caterpillar dealers in the Canal Zone, San Diego and Fort Bragg all had not been notified effectively of the change at the time they were visited by the MARCY J. Caterpillar's San Diego dealer first heard of the bracket only through a second call to Caterpillar in Peoria, Illinois, on June 1, 1973. He had not received Caterpillar's May 7, 1971, product bulletin nor otherwise known of the bracket. He communicated the news of the bracket to the caterpillar's Fort Bragg dealer while the MARCY J was being repaired there, and he ordered the bracket for delivery to plaintiff in Seattle, Washington.

Caterpillar responds that its May 1971 product bulletin and its 1972 parts book included sufficient notice of the proposed change and that even if they did not, it had no enforceable duty to inform dealers (Br. 41). Apart from the difficulties of delivery of and attention to these releases, which reasonably might have been foreseen (cf. *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121, 131 (9th Cir. 1968); *Pan Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129, 1137 (9th Cir. 1977)), neither publication explains that the bracket should be installed on engines such as the MARCY J's, as opposed to late model engines.[8] Significantly, the availability of the bracket assembly was not noted on Caterpillar's microfiche ordering system, which apparently is used for repairs. While Caterpillar contends that the microfiche system is not a repair manual, the admitted evidence shows that after the MARCY J's failures the microfiche entry was altered to make reference to the bracket assembly change.

On these facts a finding of negligent notification was proper. See generally W. Prosser, *Law of Torts* § 96 at 646–647 (4th ed. 1971); compare *Panther Oil & Grease Mfg. Co. v. Segerstrom*, 224 F.2d 216 (9th Cir. 1955). Nor can Caterpillar avoid liability by contending that it had no duty to inform its dealers of the bracket. While it is arguably true as Caterpillar contends that the lack of a bracket did not cause a safety hazard to the ship's passengers, the danger posed to the engine and the ship itself, if not the shipper's lost profits, is sufficient to create a duty to act in a reasonable fashion. *Pan Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129 (9th Cir. 1977); *JIG the Third Corp. v. Puritan Marine Insurance Underwriters Corp.*, 519 F.2d 171, 175 (5th Cir. 1975), certiorari denied, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360; *Berg v. General Motors Corporation*, 87 Wash.2d 584, 555 P.2d 818, 819 (1976). In light of the comparable development at common law of the duty to inform as reasonable conduct by a manufacturer and the clear implication of our recent opinion in *Pan Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, supra, we also reject Caterpillar's argument that the duty to inform dealers is not enforceable by the ultimate consumer. See generally *Schaeffer v. Michigan-Ohio Navigation Co.*, 416 F.2d 217 (6th Cir. 1969); *Berg v. General Motors Corporation*, supra.

**B.  Proximate Cause**

■ The key question in determining whether Caterpillar's negligence was the proximate cause of any of the MARCY J's damages is whether the failure of the ship's

---

8.  The May 7, 1971, product bulletin in a brief note does mention the vibration problem and indicates that retrofitting is possible. Even if it had been received and read by the San Diego dealer, such a brief mention in an occasional publication without highlighting or even identifying the seriousness of the problem can hardly be expected to provide adequate notice for a problem that might arise two years later. Cf. *Caruloff v. Emerson Radio & Phonograph Corp.*, 314 F.Supp. 631 (S.D.N.Y.1970), affirmed, 445 F.2d 873 (2d Cir. 1971).

alarm system constitutes an intervening cause. The facts presented at trial are sufficient to support the trial judge's conclusion that there was no intervening cause.

The first fracture was discovered by Jones' noticing a slightly higher than normal oil consumption rate and did not cause engine damage. The second fracture was the largest. Because it would take only 43 seconds to damage the MARCY J's engine from significant oil loss and takes 45 seconds to shut down the engine, it would be entirely speculative whether Jones could have shut down the engine in time to save the engine if the alarm had worked. The third fracture was smaller, thus permitting Jones to secure the engine after hearing the alarm, which had been repaired in San Diego.

Because Caterpillar therefore did not prove that functioning alarms would have avoided the engine damage, it was proper to conclude that the failure of the oil cooler supply line was the legal cause of the MARCY J's failure.[9] Even less meritorious is defendant's contention that its negligence, even granting that it was the proximate cause of the failure, was not the proximate cause of the damage to the MARCY J's outriggers during the entry to Fort Bragg. Towing into a nearby harbor with its attendant dangers hardly can be said to be an unforeseeable consequence of being forced to shut down the engine of a ship at sea. That conclusion is particularly true when as here Fort Bragg was the only available port of refuge and plaintiff's actions in raising the outrigger poles were reasonable and in fact were directed by the Coast Guard. It was certainly prudent to follow the Coast Guard's order to avoid the complete loss of the idled MARCY J in high seas.

### C. Contributory Negligence

█ Caterpillar relies on two incidents during the MARCY J's voyage to claim that Jones was contributorily negligent: his unwillingness to remain in the Canal Zone to await Caterpillar's attention and his deci-

sion to disconnect the failed alarm system without returning to port. As to Jones' decision to leave the Canal Zone, however, Caterpillar did not prove that this decision was a cause of plaintiff's damages because it is questionable at best in light of the events in San Diego whether Caterpillar's dealers in the Canal Zone would have been able to find out about or determine independently the need for a bracket. Even if in hindsight his decision not to wait was an actual cause of damage, at the time the decision to continue was a reasonable weighing of alternatives given the long delay proposed and the apparent ability to make the necessary repairs immediately. See W. Prosser, *Law of Torts*, § 65 at 425 (4th ed. 1971).

Similarly, Jones' decision to disconnect the damaged alarm and continue toward his fishing destination was not a cause of the loss, even assuming that it was an unreasonable decision in light of his reliance on the Murphy switchgage, which he could not have known was inoperative until it was disassembled. As discussed previously, there was no proof that functioning alarms would have averted the damages. Because this decision therefore may not have caused plaintiff's damages, the district court was warranted in holding that Jones was not contributorily negligent. See *Restatement of Torts 2d* § 465. Such a holding was particularly appropriate in light of the description of Jones by Caterpillar's San Diego dealer as "very prudent, very conscious of machinery and maintenance required for that machinery."

### II. Admiralty Jurisdiction and its Effect on Damages

With the exception of Caterpillar's contention, discussed previously, that it had no duty to inform about the bracket that is enforceable by a consumer, the only effect of the presence or absence of admiralty jurisdiction noted by either party is its effect on the recovery of lost profits. Under either type of jurisdiction, Caterpillar

---

**9.** No argument was made on this appeal that the inability of the alarm system to give timely warning itself was unforeseeable or constituted an intervening cause.

would of course be liable for negligence. *Pan Alaska Fisheries, Inc., supra* at 1133–1134; *Berg v. General Motors Corporation*, 87 Wash.2d 584, 555 P.2d 818 (1976), applying Washington law; *Berwind Corp. v. Litton Industries, Inc.*, 532 F.2d 1 (7th Cir. 1976), applying Illinois law. The district court held that it had only diversity jurisdiction and that under the applicable state law lost profits could not be recovered.[10]

■ Applying the two-part test of *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 254–261, 93 S.Ct. 493, 34 L.Ed.2d 454, however, it is clear that there was admiralty jurisdiction under 28 U.S.C. § 1333. The locus of the tort was on the high seas and coastal waters where the injuries occurred. *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 256 (9th Cir. 1973). Further, the wrong bore a significant relationship to a traditional maritime activity, *viz.* Jones' sailing of his fishing vessel from the purchase port to the Alaska fishing grounds. *Executive Jet Aviation v. City of Cleveland*, 409 U.S. 249, 254–261, 93 S.Ct. 493, 34 L.Ed.2d 454; *Pan Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129, 1133 (9th Cir. 1977); *Union Oil Co. v. Oppen*, 501 F.2d 558, 561 (9th Cir. 1974); *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 256–257 (9th Cir. 1973); *JIG the Third Corp. v. Puritan Marine Ins.*, 519 F.2d 171 (5th Cir. 1975), certiorari denied, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360.

■ The question whether lost profits can be recovered in this case therefore becomes the question whether lost profits can be recovered in admiralty, because admiralty rights take precedence. *Kermerac v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 3 L.Ed.2d 550; *King v. Alaska Steamship Co.*, 431 F.2d 994 (9th Cir. 1970). In admiralty it is well settled that fishing vessel owners and commercial fishermen may recover for lost fishing profits under the general maritime law of negligence. *Union Oil Company v. Oppen*, 501 F.2d 558; *United States v. Laflin*, 24 F.2d 683 (9th Cir. 1928); *Carbone v. Ursich*, 209 F.2d 178, 181–182 (9th Cir. 1953). Therefore, plaintiff is entitled to recover such damages for economic loss as he can prove.[11]

### III. Compensation for Towing

■ In its other attempt to limit the damages paid to Jones, defendant contends that plaintiff failed to mitigate damages when he towed to San Diego instead of to a closer port in Mexico after the problems off the coast of Guatemala. However, plaintiff did not know whether a dealer was available along the Mexico coast nor could he speak Spanish. San Diego was the nearest United States port with known repair facilities. The reasonableness of this decision was underscored at trial by defendant's failure to show that a closer dealer who could have accomplished the necessary repairs was available. Under these circumstances we cannot disagree with the district court's conclusion that the towing charges were reasonable when the plaintiff chose to be towed to a port where repairs were certain rather than to a location where the opportunity for repair was unknown. Fortunately the companion vessel F/V JOHN & OLAF was able to furnish the needed tow.

### IV. Denial of Motion to Add Third Party Defendant

■ On December 11, 1975, over two years after the filing of this action, after it had been set for trial, and one month before trial, Caterprillar sought to add Bender Welding & Machine Works as a third party defendant on the ground it supplied defective "oil cooler lubrication alarm systems" aboard the MARCY J. Caterpillar knew

---

10. The only authority cited for the proposition that state law barred recovery was *Berg v. General Motors Corporation*, 13 Wash.App. 326, 534 P.2d 838 (1975), but that decision was reversed while this appeal pended. 87 Wash.2d 584, 555 P.2d 818 (1976).

11. This opinion is not meant to imply that plaintiff has established all the prerequisites for recovery, such as proving that the damages were foreseeable. It means only that plaintiff is entitled to pursue this damage theory.

that Jones had so alleged when it was served with his complaint in November 1973. This motion was properly denied because Caterpillar was dilatory in presenting it. Bender had been dismissed from the action on July 11, 1975, because it had prevailed in the arbitration with Jones. Because the motion was untimely and probably would have delayed the trial, its denial was not an abuse of direction. *Merritt-Chapman & Scott Corp. v. Frazier*, 289 F.2d 849, 856 (9th Cir. 1961), certiorari denied, 368 U.S. 835, 82 S.Ct. 60, 7 L.Ed.2d 36.

Caterpillar's reliance for a contrary result on *Moore v. American Export Isbrandtsen Lines, Inc.*, 56 F.R.D. 565 (S.D.N.Y.1972), is misplaced. Although impleader was allowed in *Moore*, the cause had not yet been set for trial and the defendant seeking impleader was not dilatory but rather had unsuccessfully sought to bring the objecting party into the case at an earlier time. Even if *Moore's* emphasis on the lack of prejudice were applicable to the facts here, it would not necessarily prove that the district court in exercising its discretion could not place more weight on Caterpillar's delay and therefore deny the motion. See *General Electric Co. v. Irvin*, 274 F.2d 175, 178 (6th Cir. 1960); *East Hampton DeWitt Corp. v. State Farm Mutual Auto Insurance Co.*, 490 F.2d 1234, 1246 (2d Cir. 1973).

*Conclusion*

In Caterpillar's Appeal No. 76–2684, the order of May 21, 1976, denying the motion to add Bender Welding & Machine Works, Inc. as a third party defendant is affirmed and the judgment of April 12, 1976, is affirmed insofar as it awarded plaintiff $39,-030.22 (plus 8% interest) in damages. In Jones' Appeal No. 76–2114, the judgment of April 12, 1976, is reversed insofar as it denies plaintiff recovery for lost profits, and the case is remanded for a determination as to whether Jones is entitled to recover lost profits, and if so, the amount of such recovery.