**MARU SHIPPING CO., INC., as Owner of The Frisky, Plaintiff,**

**v.**

**BURMEISTER & WAIN AMERICAN CORPORATION and Burmeister & Wain A/S, Defendants.**

**No. 79 Civ. 5507 (LBS).**

United States District Court, S. D. New York.

Nov. 9, 1981.

As Modified March 18, 1982.

Burlingham, Underwood & Lord, New York City, for plaintiff; Robert B. Pohl, Lars Forsberg, New York City, of counsel.

Battle, Fowler, Jaffin & Kheel, New York City, for defendant; David Fleischer, New York City, of counsel.

## OPINION

SAND, District Judge.

Briefly stated, the principal issue raised in this case, which has been tried to the Court, is the extent to which the defendant, who sold defective parts for use in the auxiliary engines of plaintiff's vessel, is responsible in damages for the amount of time the vessel was tied up in port while the cause of the engine's malfunctioning was being determined and remedied, where much of this time was spent examining and repairing other deficiencies in the engines for which defendant was not responsible.

## I. FACTS

In 1977, plaintiff purchased for $400,000 a vessel which had gone aground off Cuba and undertook to repair and rehabilitate the vessel, renamed the M/V Frisky. The three auxiliary engines on the vessel had been manufactured by a Brazilian licensee of Burmeister & Wain A/S.[1] In 1977, plaintiff asked a representative of B&W to inspect the auxiliary engines and to recommend how they should be repaired. B&W

recommended that the engines be replaced. Plaintiff, however, decided to overhaul the three auxiliary engines and to utilize the labor of its own crew in doing this. Various replacement parts, including five connecting rods, were ordered by plaintiff from B&W for this purpose.

Plaintiff ultimately expended approximately $4,000,000 in repairing the vessel, of which $950,000 was spent on hull repairs done in Greece. The ship thereafter operated on charter as a scrap metal carrier, but experienced a malfunctioning in its auxiliary engines.

Each of the three auxiliary engines has a crankshaft and five connecting rods which transmit energy generated by the rotating crankshaft. Each connecting rod is attached to the crankshaft bar (journal) as illustrated in the diagram annexed hereto as Appendix I. As will be seen by reference to Appendix II, the connecting bar itself ends in a half oval. A second object, known as a cap, is attached to the connecting rod by bolts forming a circle or aperture through which the journal passes. The bolts which connect the cap to the connecting rod intrude into the aperture at two sides. A metal bearing is placed between the connecting rod and the journal to reduce friction and enable the parts to move freely. This bearing, manufactured by others, was sold by B&W to plaintiff for use in conjunction with the connecting rods, some of which were ordered from B&W and installed in Greece, and some of which may have been of original manufacture, i.e., made by B&W A/S's licensee and aboard the vessel when purchased by plaintiff. The bearings consist of two half ovals of a special metal mixture, with provisions for lubrication and two recesses designed to accommodate the bolts which hold the cap to the connecting rod where they intrude into the aperture. It was these bearings which were overheating, causing a deterioration in the bearings (wiping, melting, etc.) and a malfunctioning of the engines.

---

1. This defendant, a Norwegian company, now in receivership, has defaulted, and as to it, this proceeding is therefore in the nature of an inquest as to damages. Burmeister & Wain American Corporation (hereinafter "B&W") has appeared and defended this action.

Plaintiff's vessel put into Venezuela and requested that B&W send a service representative to ride the vessel to Boston and report on the cause of the malfunctioning. Mr. Jorgen Sorenson boarded the vessel in Venezuela, observed a large quantity of burned out bearings, and was advised that a new crankshaft had been ordered for installation in Boston, the vessel's next port, and that the crew was going to strip down # 2 engine en route to Boston. (It was undisputed at the trial that prudent seamanship requires that there be at least two operative auxiliary engines prior to sailing). Sorenson determined that he could accomplish nothing by accompanying the vessel to Boston and so he left her in Venezuela but rejoined her in Boston.

In Boston, he engaged in a systematic appraisal of the possible causes of the bearing problem. He discovered a great many respects in which the engines failed to conform to the operating procedures prescribed and recommended by B&W. These included the following: remetalling of the journals with chromium, improper tightening of the bolts,[2] lack of proper maintenance and cleaning, misplacement of lubricating gauges, misalignment of # 3 engine with its generator, etc.

Sorenson undertook, during the period from January 25, 1979 to March 22, 1979 to correct these conditions, except that he did nothing to remedy the misalignment of the # 2 engine and generator. His testimony was that he called this condition to the attention of plaintiff's attending supervisor (Mr. Mendel) and that, since the indicated procedure was to realign the generator rather than the engine, he regarded it as being beyond the scope of his engagement.

A vigorous controversy exists as to the extent to which Sorenson in Boston detected what is now asserted to be "the cause" of the bearing failures. Sorenson testified, and the Court finds, that in addition to numerous other steps and inquiries that he made, including an enlargement of the connecting rod aperture which he found to be not within acceptable tolerances, he deepened the recesses on the bearings on the # 3 engine so that the bolts would not pinch the bearing.

Ultimately, Sorenson reported that the engines were in operating condition. He left with Mendel some written instructions and a sketch for the use of the crew. The written instructions indicated that the recesses should be given special attention.

On March 22, 1979, the M/V Frisky sailed for Korea, but put into Cape Canaveral as a port of haven because of continued problems with the auxiliary engines. Sorenson and another diesel expert, independently engaged by plaintiff, examined the engines in Cape Canaveral.

It was determined that two causes for the continued difficulties existed: 1) the misalignment of the # 2 engine and generator, and 2) the pinching of the bearings by the bolts in engines # 1 and # 2, the recesses of which bearings had not been deepened by Sorenson in Boston because these bearings were not overheating at that time. The recesses on all bearings were deepened by filing and the generator on # 2 was realigned in Cape Canaveral, and no further difficulties have been experienced by the M/V Frisky with her auxiliary engines.

Mr. Sorenson, although he testified to the number of deficiencies he observed in the engines, described the pinching of the bearings by the bolts, a condition remedied by filing and thereby deepening the bearing recesses, as "the cause" of the problem.

It, of course, makes little difference whether one regards the connecting rods or the bearings as being defective. Both were supplied by B&W to function in conjunction with each other, as related moving parts.

**2.** Sorenson testified that it was important that the correct pressure be applied by the bolts that connect the cap to the connecting rod, that a special torque wrench be utilized for this purpose, and that the bolts be tightened in a prescribed sequence. If the bolts are too loose or too tight, wear will occur at the serrated edges where the cap and connecting rod meet to form the aperture, or other undesirable consequences will result. Sorenson found that this procedure had not been followed and that the bolts had been improperly tightened.

Plaintiff claims that but for the defects and the delay by the defendant in their discovery of the cause of the problems, the M/V Frisky, which had completed loading in Boston on February 3, 1979, would have sailed on February 4, 1979, pursuant to its charter. It seeks, among other things, damages in the amount of $211,500 for time lost because of these circumstances.

Defendant denies that it is at all responsible for any collateral damages sustained by plaintiff, and asserts that its liability is limited to the cost of the defective parts. Defendant also denies that the M/V Frisky could have sailed on February 4, and that plaintiff in fact sustained the damages it claims because of circumstances for which B&W is responsible.

## II. JURISDICTION AND APPLICABLE LAW

As stated in Maru's complaint, the plaintiff's various tort and contract claims are properly brought under the admiralty jurisdiction of this Court. *See Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (tort test of locale and relationship to maritime activity); *North Pacific Steamship Co. v. Hall Brothers Railway & Shipbuilding Co.*, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919) (contract test of maritime subject matter).

■ The law to be applied in this case is federal, since the rationale behind the Court's admiralty jurisdiction is the strong federal interest in dealing with all the major concerns of the shipping industry as one body of law. *See* G. Gilmore & C. Black, The Law of Admiralty, 29 (2d ed. 1975). The Constitution and federal statutes are silent, however, as to the substantive law governing maritime tort and contract claims in which there is no injury to person or property, but only economic damage. The issues raised in this case, then, require this Court to apply a body of federal maritime law of torts and contracts. Where the federal law of the sea provides this Court with no clear precedent for the resolution of a particular legal problem, we may look to the prevailing law of the land as applied by the states. *See Igneri v. Cie. de Transports Oceaniques*, 323 F.2d 257, 259 (2d Cir. 1963), cert. denied, 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964); *Littlehale v. E. I. du Pont de Nemours & Co.*, 268 F.Supp. 791, 797 (S.D.N.Y.1966), aff'd. 380 F.2d 274 (2d Cir. 1967).

## III. MARU'S TORT CLAIMS

■ Maru claims that B&W should be found liable on the theory that its service engineers were negligent in failing to isolate and correct the cause of the overheating of the connecting rod bearings. The Court finds no merit in this allegation. The evidence amply demonstrates that the defendant's representatives, by carefully testing the engines and repairing many of its defects, acted in accordance with the standard of performance of a reasonable engineer under the same circumstances.

The plaintiff also asserts that the defects in the bearing shells and connecting rods sold by the defendant made those parts unreasonably dangerous to the vessel. Maru therefore claims that B&W should be liable under a theory of strict liability in tort, as set forth in the Restatement (Second) of Torts § 402A(1) (1965) which provides that: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property. . . ."

■ The Court finds that the theory of strict liability in tort is inapplicable to the facts of this case. Two lines of cases have developed among the states as to whether strict liability may be invoked in situations of purely economic loss. One line is exemplified by the New Jersey case of *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 207 A.2d 305 (1965), in which the court indicated that liability for defective products should not depend on the fortuity of what type of damage the defect causes. The second line of cases found its initial expression in *Seely v. White Motor Co.*, 63 Cal.2d 9, 403 P.2d 145, 45 Cal.Rptr. 17 (1965), a

case in which the California Supreme Court stated that strict liability in tort was designed to deal only with cases involving physical injuries.

In determining the content of federal maritime law, this Court joins with the majority of states in adopting the *Seely* approach of denying strict liability recovery for purely economic losses. *See, e.g., Jones & Laughlin Steel v. Johns-Manville Sales,* 626 F.2d 280 (3d Cir. 1980) (applying Illinois law); *Two Rivers Co. v. Curtiss Breeding Service,* 624 F.2d 1242 (5th Cir. 1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 348 (1981) (applying Texas law); *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751 (3d Cir. 1976) (applying Pennsylvania law). Rather, the Uniform Commercial Code ("UCC") should cover the questions of liability and damages in such cases.

The Restatement (Second) of Torts' use of the words "dangerous" and "physical harm" support the notion that strict liability in tort is designed to govern the particular problem of actual physical injuries, rather than that of damages for inadequate value, costs of repair and replacement of a defective product, or loss of profits in the absence of physical injury. Furthermore, purely economic damages are not the type protected by the social policy of strict liability to protect consumers and distribute the costs of dangerous defects to the consuming public. As was explained in the *Two Rivers* case, strict liability was not intended to provide a remedy for a disappointed buyer, and it would therefore be inappropriate to burden the public with additional costs resulting from a consumer's unfulfilled commercial expectations. 624 F.2d at 1251. Since Maru alleges no physical harm to person or property resulting from the condition of the parts supplied by B&W, its remedies for the failure of these parts to perform according to the contractual bargain are governed by commercial law.

## IV. MARU'S WARRANTY CLAIMS

█ The plaintiff alleges that B&W breached its implied warranty of workman-

like service because its service engineers failed to discover and correct the cause of the bearing failures. It is firmly established in this Circuit that one who contracts to supply services impliedly agrees to perform in a diligent and workmanlike manner. *See Fairmont Shipping Corp. v. Chevron International Oil Co., Inc.,* 511 F.2d 1252 (2d Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 66, 46 L.Ed.2d 57 (1975). Although breach of this warranty does not depend on proof of negligence, the plaintiff has the burden of showing that the defendant's behavior was not "justified." *Id.* at 1260. The question this Court must answer, then, is not "Did the B&W servicemen act in a reasonable manner?" but "Did they perform in a manner that was substantively proper?" Since there is substantial evidence of the diligent and methodical way in which the B&W service engineers searched for, and repaired, a great many of the engines' defects, the Court finds that their actions were justified. Hence, there was no breach of B&W's implied warranty of workmanlike service.

█ Maru also asserts that B&W breached its implied warranties that the parts it sold were merchantable and fit for the purpose for which they were intended. The evidence of bearing failures adduced in this case makes it obvious that the parts supplied by B&W were not fit for the ordinary purposes for which such goods are used. The evidence also amply demonstrates that B&W had reason to know of the particular purpose for which the parts were required and that Maru was relying on B&W's skill and judgment in selecting parts. The Court, therefore, finds that B&W breached both its implied warranty of merchantability under UCC § 2–314 and its implied warranty of fitness for the purpose intended, under UCC § 2–315.

## V. THE MEASURE OF DAMAGES

UCC § 2–714(2) controls the assessment of damages for B&W's breach of its implied warranties. That section indicates that the

buyer may recover the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if the goods had been as warranted, unless special circumstances show proximate damages of a different amount. Maru claims almost $400,000 of such special and consequential damages for, among other things, its lost profits from the M/V Frisky's delays in Boston and Cape Canaveral and the costs associated with repair work done on the ship.

■ B&W asserts that a disclaimer of consequential damages, which appeared on the back of its acknowledgment form, became a valid term of the contract. Since Maru is not a dealer in ship parts of the kind at issue in this case, UCC § 2–207 indicates that the terms of the acknowledgment should be taken as proposals of additional terms to the pre-existing oral contract. B&W's contention that, despite the fact that Maru had accepted the parts before receiving the acknowledgment form, Maru's subsequent use of the parts constituted an acceptance of the disclaimer, is unsupported by the law. B&W also maintains that a disclaimer of consequential damages should be implied as part of its contract with Maru as a trade usage in the shipping industry. Since B&W presented insufficient evidence at trial of the practice, method, or regularity of observance of such provisions, the Court does not find that limitation of liability for consequential damages is a trade usage in the shipping industry. Thus, Maru is entitled to recover its appropriate measure of consequential damages resulting from B&W's breach.

■ Anglo-American law has adopted the principle that damages recoverable for a breach of contract are limited to those which must reasonably be supposed to have been contemplated or foreseen by the parties at the time the contract was made, as the probable result of the breach. *See Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854). Costs associated with the actual repair of the defective parts, as well as lost profits stemming from delays resulting from the breach (which were shown by Maru to be reasonably computed at $4500 per day) [3], may confidently be considered to have been within the reasonable contemplation of the parties in this case.

It remains, then, for the Court to assess what damages may rightly be attributed to B&W's breach, and what damages were the result of conditions and decisions for which Maru is responsible.

■ Several of Maru's damage claims may be rejected at the outset. The plaintiff is not entitled to recover the cost of remilling or remetalling the crankshaft, for there has been no evidence that B&W parts were responsible for the particular damage to the crankshafts. Likewise, car rental costs, expenses for Mr. Mendel, and telephone and telex costs are inadequately demonstrated in the record to have been attributable to B&W's breach of its implied warranties. Furthermore, B&W cannot be charged with the surveys conducted by Mr. Robert Morris in Boston, a non-expert engaged by Maru, who was unfamiliar with the situation aboard the M/V Frisky. It is equally clear, however, that B&W must compensate Maru for repairs made to defective bearings prior to January, 1979.

The plaintiff's largest claim of damages stems from time lost in Boston. Maru's assertion that, but for B&W's breach, the M/V Frisky would have sailed on February 4, 1979, is not correct. Maru waited from December until January 11, 1979 to buy a crankshaft for the ⊰ 3 engine, and this equipment was airfreighted to Boston. The crankshaft arrived at the ship on February 2, and by Maru's own admission, it takes about 10 days to install a crankshaft. Thus,

3. The Court rejects B&W's contention that this figure should be halved, since the defendant made an inadequate showing in support of its claim that the M/V Frisky would have travelled from Korea with no cargo.

the record indicates that the M/V Frisky would not have sailed before February 12. The record fully supports the notion that the Frisky would have sailed immediately upon the successful resolution of the bearing problem during the 38 day period between February 12 and March 22.

The fact that Maru used the delay in Boston to repair other parts of the ship is of no relevance in assessing the damages chargeable to B&W. However, the time expended in determining the causes of the bearing problem was a function of many interacting factors, some of which were the fault of Maru and some of which were B&W's responsibility. B&W is justly chargeable for the time it took to identify the fact that the bearing shells had to be scraped, the connecting rods bored, and the bearing recesses filed. It is also chargeable with the time required to complete these tasks. However, the failure of Maru's staff to correctly tighten the connecting rod bolts and its failure to properly maintain the lubricating system also contributed to the time it took to determine the cause of the bearing problem and to correct it.

On the basis of these factors, the Court determines that B&W's breach of its warranties caused 70% of the delay in Boston, and that Maru is responsible for 30% of that time. The same percentages may be applied to Maru's damage claims with respect to its agent's disbursement account at Boston. Of the $19,943.38 that Maru claims it should receive as the cost of repairs, only $3,210.16, the cost of boring and honing the connecting rods, may confidently be assessed against B&W. Finally, with respect to the Boston claims, the Court finds no basis on which to charge B&W for the two shipfitters Maru decided to hire. It was Mr. Mendel's testimony that the shipfitters worked on parts of the engines other than those associated with the connecting rod bearings problem, but no attempt was made to allocate a portion of the damages claim to that aspect of their work.

Maru also claims substantial damages for the delay at Cape Canaveral. Part of this delay was the result of the inadequate depth of the bearing recesses. However, a large portion of the delay is attributable to the failure of the guide bearing on the # 2 engine, which the evidence clearly showed was caused by a "deflection" problem which was not B&W's responsibility. As a result of these considerations, the Court finds that B&W may be charged with only 40% of the seven day delay at Cape Canaveral, the two day delay travelling to and from that location, the fuel required for the deviation, and the agent's disbursement account there. As with the claim for the shipfitters, the evidence fails to provide an adequate basis upon which the Court can allocate a portion of the mechanic's charges to that work done on the recesses in Cape Canaveral.

Since, when the Frisky left Cape Canaveral, B&W's parts were in their warranted condition, the Court denies recovery for any expenses Maru chose to incur after that point. The Court also rejects the contention that, on the basis of the record in this case, B&W should pay whatever allowance for late delivery was negotiated between Maru and its cargo buyers. Plaintiff has not adequately demonstrated the reasonableness or foreseeability of these damages.

The damages to be assessed against B&W may be computed as follows:

| | |
|---|---:|
| Repairs Prior to 1/79 | $ 2,973.00 |
| Delay in Boston | 119,700.00 |
| Agent's Disbursement Account in Boston | 14,409.04 |
| Repairs in Boston | 3,210.16 |
| Deviation to Cape Canaveral | 3,600.00 |
| Fuel for deviation | 2,505.00 |
| Delay at Cape Canaveral | 12,600.00 |
| Agent's Disbursements at Cape Canaveral | 3,745.60 |
| | $ 162,742.80 |

B&W counterclaims in the amount of $132,503.71 for unpaid bills for its parts and services, plus interest. The amount of B&W's valid counterclaim must be subtracted from $162,742.80 to determine the amount it is required to pay Maru.

Settle order on notice.

# Appendix I

APPENDIX II