732 F.2d 1468
 1985 A.M.C. 2069, 39 Fed.R.Serv.2d 281
 EMERSON G.M. DIESEL, INC., Plaintiff,
v.
ALASKAN ENTERPRISE, Official No. 595760, Her Engines,
Tackle, Apparel, Furniture and Equipment, In Rem; Offshore
Fisheries, Inc., a Washington corporation; Miller
Industries, Inc., a Washington corporation; and Francis L.
Miller, In Personam, Defendants/Third-Party Plaintiffs Appellees,
v.
GENERAL MOTORS CORPORATION, Third-Party Defendant,
and
Twin Disc, Inc., Third-Party Defendant/Appellee.
 Nos. 83-3502, 83-3503.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 7, 1983.
Decided May 11, 1984.
 
 Arthur D. McGarry, Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., for third-party defendant/appellee.
 Jay H. Zulauf, Matthew Cohen, Mundt, MacGregor, Happel, Falconer, Zulauf & Hall, Seattle, Wash., for defendants/third-party plaintiffs appellees.
 On Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, PREGERSON, and FERGUSON, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Twin Disc, the manufacturer of components used in diesel engines, appeals from a $254,047.06 judgment entered against it in favor of the Alaskan Enterprise, a fishing vessel. A ruptured hose on a reduction gear manufactured by Twin Disc caused the gear unit to overheat, disabling the Alaskan Enterprise's port engine while the vessel was sailing in the Bering Sea. The district court held Twin Disc strictly liable for the Alaskan Enterprise's repair costs and lost profits. We affirm.I. Facts
 
 
 2
 Twin Disc supplied a reduction gear unit that was incorporated in a diesel engine installed on the Alaskan Enterprise, a 150 foot, steel-hulled fishing vessel. An essential component of the reduction gear was a hose that carried lubricating oil between the manifold and oil pump of the gear unit. Twin Disc did not manufacture the hose, but selected it, and installed it on the reduction gear unit. The district court found that Twin Disc had not stress-tested the hose. The district court also found that Twin Disc's reduction gear unit was designed to accommodate a temperature sensor, which could be plugged into a system that would warn the crew when the gear unit was overheating. Twin Disc did not install the temperature sensor on the reduction gear, but shipped it separately for later installation. The court found that Twin Disc did not provide clear and adequate instructions regarding the installation of the temperature sensor, and as a result, the device was never installed on the Alaskan Enterprise.
 
 
 3
 In 1978, during a fishing trip in Alaskan waters, the reduction gear hose ruptured. Oil drained out of the system. The gear overheated and became immobilized, disabling the port engine. The vessel was only two hours out of Kodiak when the hose ruptured, and was able to return to port on one engine. Because of the reduction gear's failure, the Alaskan Enterprise was out of service for a sixteen-day period at the height of the 1978 king crab season, one of the most successful in Alaskan crab industry history.
 
 
 4
 The reduction gear unit was repaired and the Alaskan Enterprise operated without incident until the spring of 1980, when mechanics during routine maintenance discovered a crack in the metal casing of the reduction gear. The district court found that the cracked casing was a result of the 1978 overheating incident. The casing had to be replaced, resulting in more repair bills.
 
 
 5
 Emerson G.M. Diesel, the company doing the repair work, brought suit in admiralty to foreclose a lien on the vessel because the Alaskan Enterprise, for reasons not clear from the record, failed to pay the repair bill. The Alaskan Enterprise then brought a third-party claim against Twin Disc for indemnity. The main action was settled prior to trial, leaving the third-party claim. The Alaskan Enterprise elected to proceed in admiralty and, over Twin Disc's objection, a court trial was held.
 
 
 6
 The district court found Twin Disc strictly liable and awarded the Alaskan Enterprise damages for both repairs and lost fishing profits. Twin Disc appeals, contending (1) that the district court erred in denying a jury trial; (2) that the district court erred in holding that the Alaskan Enterprise could recover for purely economic losses--e.g., the cost of repairs and lost profits; and (3) that the district court's finding of fact that Twin Disc supplied the defective hose was clearly erroneous. The Alaskan Enterprise cross-appeals, contending that the district court should have found Twin Disc liable on negligence and breach of warranty theories as well as under the doctrine of strict liability in tort. We address these contentions in order.
 
 II. Denial of Jury Trial
 
 7
 The Alaskan Enterprise originally labelled its third-party claim against Twin Disc as one "in admiralty and at law," and demanded a jury trial.[1] Later, the Alaskan Enterprise decided to proceed without a jury in admiralty,[2] and so informed the district court orally at the pre-trial conference. Several days later, the Alaskan Enterprise filed a formal waiver of jury demand, stating explicitly that it was proceeding in admiralty. Twin Disc objected to the waiver and argued that the Alaskan Enterprise could not waive a jury without Twin Disc's consent. The case was tried to the court over Twin Disc's objection. Twin Disc now contends that the district court erred in denying a jury trial. We find the argument without merit and conclude that the Alaskan Enterprise properly elected to try the case in admiralty.
 
 
 8
 The procedure followed by the Alaskan Enterprise in withdrawing its jury demand complied with Rules 9(h) and 15, Fed.R.Civ.P. When a claim is cognizable either at law or in admiralty, the pleader may elect to proceed in admiralty, without a jury, by filing an identifying statement under Rule 9(h). The election need not be made in the original pleading. Rule 9(h) provides that a pleading may be amended to add or withdraw such an identifying statement in accordance with Rule 15. Rule 15 provides that a party may amend its pleading once as a matter of course before a responsive pleading is served (or if a responsive pleading is not required, within 20 days after service) or by leave of court or by written consent of the adverse party. Rule 15 provides further that leave to amend shall be freely given where justice so requires.
 
 
 9
 Twin Disc argues, however, that Rule 38(d) Fed.R.Civ.P.--which provides that "[a] demand for trial by jury ... may not be withdrawn without the consent of the parties"--prohibits the Alaskan Enterprise from withdrawing its jury demand without Twin Disc's consent. Twin Disc relies on a Fifth Circuit decision, Johnson v. Penrod Drilling Company, 469 F.2d 897, 903 (5th Cir.1972), reh'g granted, 478 F.2d 1208 (5th Cir.1973), reh'g, 510 F.2d 234 (5th Cir.), cert. denied, 423 U.S. 839, 96 S.Ct. 69, 46 L.Ed.2d 58 (1975), overruled on other grounds, Culver v. Slater Boat Co., 688 F.2d 280, 283 (5th Cir.1982). In Johnson, the Fifth Circuit held that injured seamen who asserted both diversity jurisdiction and Jones Act jurisdiction could not, through the device of amending their complaint to state admiralty and maritime claims, effectively withdraw their demand for a jury trial without obtaining the defendant's consent.
 
 
 10
 We considered this same issue in McCrary v. Seatrain Lines, Inc., 469 F.2d 666 (9th Cir.1972) and came to the opposite conclusion. In McCrary, a shipowner filed a third-party complaint for indemnity against a stevedoring company. At the pre-trial conference, the district judge determined that the shipowner's indemnity claim lay solely in admiralty, and therefore rejected the shipowner's proffered Rule 9(h) amendment as redundant. On appeal, we held that the indemnity action did not lie solely in admiralty, but that the district court's denial of a jury trial was proper nonetheless, because the court should have accepted the 9(h) amendment and allowed the action to proceed in admiralty without a jury. We flatly rejected the stevedoring company's argument that the court could not permit an amendment which would eliminate a jury trial without the stevedore's consent. We said:
 
 
 11
 A shipowner has the right, if exercised by a timely designation, to assert through Rule 9(h) recourse to traditional admiralty practice and thus to obviate the jury trial on the third-party claim.
 
 
 12
 In this case, the shipowner made a timely effort to amend and the net result of the procedure followed was the same as if the motion and amendment had been allowed.
 
 
 13
 469 F.2d at 668.
 
 
 14
 We find that under McCrary, the Alaskan Enterprise could amend its thirdparty complaint under Rule 9(h) and proceed in admiralty without Twin Disc's consent. In the instant case, the designation of the third-party action as an admiralty matter was made at the pre-trial conference, which was when the designation held permissible in McCrary was made.[3] Under Rule 15, the district court's decision to allow the amendment was within its discretion, and we do not think that discretion was abused. Twin Disc had no right to a jury trial under admiralty law. It cannot claim surprise, because the claim was designated as both in admiralty and at law from the very beginning, and indeed the claim had to proceed in admiralty until complete diversity was achieved. Twin Disc does not argue that it was forced to develop its case differently, or call different witnesses. See Fruin-Colnon Corp. v. M.G. Transport Service, 79 F.R.D. 674, 677 (S.D.Ill.1978) (plaintiff's motion to proceed in admiralty and to eliminate jury was made on the eve of trial, but court found no prejudice because defendant would have presented same proof and witnesses).
 
 
 15
 In short, the situation here is almost identical to the situation in McCrary where we expressly held that the plaintiff could avoid a jury trial by electing to proceed in admiralty. Twin Disc's argument that denial of a jury trial requires reversal lacks merit.
 
 III. Recovery of Economic Damages
 
 16
 The district court found that the Alaskan Enterprise was entitled to $227,919.64 in lost fishing profits and $32,159.70 in repair costs, less a $6,032.28 reimbursement received from General Motors. Twin Disc and amicus Caterpillar Tractor Company contend that the district court erred in awarding damages for purely economic losses in a strict liability admiralty action. We disagree and affirm the district court.
 
 
 17
 The general rule is that economic losses, e.g., loss of profits and repair costs, are not recoverable by an aggrieved buyer against a nonperforming seller under tort theories of negligence or strict liability because the buyer's rights are limited to warranty law. See Jones & Laughlin Steel v. Johns-Manville Sales, 626 F.2d 280, 287-88 n. 13 (3d Cir.1980) (extensive citation of authorities); S.M. Wilson & Co. v. Smith International, Inc., 587 F.2d 1363, 1376 (9th Cir.1978). The rule in admiralty is different. Recovery of economic losses is permitted against a manufacturer of defective goods when liability is based on negligence. Jones v. Bender Welding & Machine Works, Inc., 581 F.2d 1331, 1337 (9th Cir.1978). "In admiralty it is well settled that fishing vessel owners and commercial fishermen may recover for lost fishing profits under the general maritime law of negligence." Id. See also Union Oil Co. v. Oppen, 501 F.2d 558, 567 (9th Cir.1974) (holding that commercial fishermen whose harvests were depleted in the tragic Santa Barbara oil spill could recover lost profits from Union Oil Company in a negligence action); Carbone v. Ursich, 209 F.2d 178, 182 (9th Cir.1953) (members of crew of fishing vessel recovered lost profits from owners of another vessel that negligently fouled their nets). The rationale for the rule allowing recovery of lost profits in an admiralty negligence action is "the familiar principle that seamen are favorites of admiralty and their economic interests entitled to the fullest possible legal protection." Id.
 
 
 18
 There is no federal circuit authority, however, deciding whether economic losses are recoverable as damages in admiralty actions based on strict liability.[4] This is not too surprising because strict liability was only recently incorporated into admiralty law. See Pan-Alaska, Fisheries, Inc. v. Marine Construction & Design Co., 565 F.2d 1129, 1134 (9th Cir.1977). The rationale for permitting recovery of economic losses in an admiralty negligence action also supports recovery of economic losses in an admiralty strict liability action.[5] The actions are somewhat similar. See 4 B. Witkin,Summary of California Law Sec. 812 (8th ed. 1974). Each requires that the negligent action or defective product proximately cause the plaintiff's injuries and that the plaintiff mitigate its losses. More importantly, each requires an element of fault. Under a negligence theory the fault arises from a failure to adhere to an accepted standard of conduct. Under strict liability, fault lies in the placing of a defective product in the stream of commerce. The manufacturer is not an absolute insurer under strict liability. The plaintiff cannot recover simply because he was injured by the product; he must show that the product was defective and that the product was used in a reasonably foreseeable way.
 
 
 19
 Allowing an admiralty plaintiff to recover lost profits promotes the primary purpose of the strict liability doctrine which is to protect consumers from losses caused by defective and unreasonably dangerous products. Liability is imposed on the manufacturer because the manufacturer is in a better position than the purchaser or consumer to spread the cost of insuring against losses caused by the defective product and to prevent such products from entering the stream of commerce in the first place. See W. Prosser, Law of Torts Sec. 75 (4th ed. 1971). Extending the scope of the manufacturer's liability to economic losses would provide manufacturers with additional incentive to spread the cost of insuring against losses resulting from product defects, as well as an incentive for manufacturers to produce safer products.
 
 
 20
 Twin Disc and amicus curiae argue, however, that this court should adopt the rule followed in most states[6] that recovery of economic loss is not available in strict liability. The leading case on this subject is Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). There Justice Traynor emphasized that the law of warranty was the appropriate basis for the recovery of economic loss:The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.
 
 
 21
 Id. at 18, 45 Cal.Rptr. at 23, 403 P.2d at 151.
 
 
 22
 We decline to follow Seely in the case at hand for a number of reasons. First, its rule against awarding economic loss has become riddled with exceptions. A plaintiff can now recover economic losses if he has also suffered some personal injury or property damage. See, e.g., Hales v. Green Colonial, Inc., 490 F.2d 1015 (8th Cir.1974). Requiring recovery for economic loss to depend on the presence of personal injury or property damage is an arbitrary distinction leading to opposite results in cases that are virtually the same. For instance, if the reduction gear unit in the Alaskan Enterprise had caused some physical damage to the ship itself or its crew members, the appellants would have unquestionably recovered their lost profits. Yet, because only the unit itself was damaged, Seely if followed would operate to deny the recovery of lost profits, even though the overall loss in both cases would be essentially equivalent.
 
 
 23
 Second, Seely seems to regard economic loss as inherently different from property damage or personal injury and therefore not properly redressed by tort liability.[7] We disagree. Economic loss is no different from personal injury or property damage in the sense it is also a loss that is proximately caused by the defendant's conduct. Here, the appellants were not only deprived of the value of a merchantable reduction gear unit but also of their livelihood--several weeks' profits during the height of the king-crab season.
 
 
 24
 Finally, we disagree with the Seely court's concern that providing for the recovery of economic loss in strict liability would expose manufacturers to "damages of unknown and unlimited scope." 63 Cal.2d at 17, 45 Cal.Rptr. at 22-23, 403 P.2d at 150-51. The manufacturer knows the purpose for which its product is to be used and by whom. Although all purchasers are not identical, the manufacturer can determine within a reasonable range of predictability the ramifications of a product failure for the ordinary user. Having this information, the manufacturer can include in its costs the expense of adequate insurance coverage.[8]IV. The Court's Finding that Twin Disc Supplied the Hose.
 
 
 25
 A products liability plaintiff must prove that the product was defective when it left the hands of the manufacturer and that the product reached the user or consumer without substantial change. Restatement (Second) of Torts Sec. 402A (1965). The district court found that Twin Disc selected and supplied the defective hose and that the hose was not altered or changed when it reached the consumer. Twin Disc argues that these findings are clearly erroneous. We have reviewed the record and disagree.
 
 
 26
 Twin Disc also argues that the only explanation for the district court's findings is that the court incorrectly assigned the burden of proof. There is no evidence in the record that the district court made a mistake of law regarding the burden of proof. Twin Disc simply infers that the district court used an incorrect burden of proof from the fact that its version of the facts was not accepted. Alaskan Enterprise introduced adequate evidence to prove that Twin Disc supplied a defective hose that was not damaged or altered after it left Twin Disc's hands. Although Twin Disc presented conflicting evidence, it does not appear that the only way the district court could have found for Alaskan Enterprise was by using an erroneous burden of proof.
 
 
 27
 Moreover, even assuming that the hose in question was not supplied by Twin Disc, or that the hose was altered or damaged after leaving Twin Disc's hands, the district court found that Twin Disc was liable on another account. The court found that Twin Disc followed the practice of not installing a temperature-sensing device on the reduction gear, but rather shipped the device separately for later installation. The district court found that Twin Disc supplied no clear instructions warning the purchaser to install the temperature sensor on the gear unit. The evidence showed that the Alaskan Enterprise was equipped with a sophisticated warning system that could have easily accepted the temperature sensor. Had the temperature sensor been installed, the crew would have received advance warning of the reduction gear's overheating and thus could have prevented the damage. Twin Disc does not defend its practice of shipping the temperature gauge separately, or its failure to provide clearer instructions. Rather, Twin Disc says that there was no proof that installation of the sensor would have warned the crew and prevented damage to the gear. The inference drawn by the district court that such installation would have avoided the damage is commonsensical and not clearly erroneous.
 
 V. The Cross-Appeal
 
 28
 The Alaskan Enterprise presented three theories of recovery to the district court--strict liability, negligence, and breach of implied warranties. The district court held in favor of the Alaskan Enterprise on the strict liability theory. The court's conclusions of law do not state whether the Alaskan Enterprise was entitled to recover based on the alternate theories of negligence and breach of implied warranties.
 
 
 29
 In view of our holding that economic losses such as lost profits and repair expenses are recoverable in admiralty strict liability actions, the district court's failure to reach a decision on the other theories is harmless.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 The main action by Emerson G.M. Diesel, Inc. against Alaskan Enterprise for foreclosure of a maritime lien was cognizable solely in admiralty, both because it was an action in rem and because complete diversity was lacking. The Alaskan Enterprise's third-party claim against Twin Disc for indemnity was cognizable in admiralty because damage to the vessel occurred on the high seas and the wrong bore a significant relationship to traditional maritime activity. See Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 254-261, 93 S.Ct. 493, 497-501, 34 L.Ed.2d 454 (1972); Jones v. Bender Welding & Machineworks Inc., 581 F.2d 1331, 1337 (9th Cir.1978) (holding that where damage to fishing vessel resulting from negligence of engine manufacturer in designing oil cooler supply line occurred on the high seas, suit was within federal district court's admiralty jurisdiction)
 When the main action was settled and Emerson G.M. Diesel dropped out of the law suit, complete diversity existed between the remaining parties--Alaskan Enterprise and Twin Disc. Thus, Alaskan Enterprise's action for indemnity against Twin Disc was cognizable both at law and in admiralty.
 
 
 [2]
 There is no right to jury trial in admiralty. See, e.g., Fed.R.Civ.Proc. 38(e)
 
 
 [3]
 The fact that the Rule 9(h) election was made orally and informally as an initial matter is of no consequence. The record shows that the Alaskan Enterprise filed a written waiver of jury trial and that Twin Disc filed a memorandum in support of its demand for a jury trial. The fact that Alaskan Enterprise denominated its Rule 9(h) election as a waiver of jury trial is not important. See Doucet v. Wheless Drilling Company, 467 F.2d 336, 341 (5th Cir.1972) (plaintiff's waiver of jury trial was a sufficient election to proceed in admiralty)
 
 
 [4]
 The district courts appear to be split. Two cases from the Southern District of New York deny recovery of lost profits. See Anglo Eastern Bulkships Ltd. v. Ameron, Inc., 556 F.Supp. 1198, 1204 (S.D.N.Y.1982) (noting that the majority of jurisdictions deny recovery for economic losses in strict liability actions), and Maru Shipping Company, Inc. v. Burmeister & Wain American Corp., 528 F.Supp. 210, 215 (S.D.N.Y.1981) (noting that strict liability was meant to apply only where there was actual physical injury, not injured commercial expectations)
 On the other hand, damages for the loss of use of a vessel were held recoverable in Miller Industries, Inc. v. Caterpillar Tractor Co., 473 F.Supp. 1147, 1156 (S.D.Ala.1979), vacated on other grounds, 516 F.Supp. 84 (S.D.Ala.1980). In that case, the court found that plaintiffs were entitled to recover for loss of use of a vessel where the manufacturer of a malfunctioning engine was held strictly liable.
 
 
 [5]
 A California appellate court recently made no distinction between negligence and strict liability in finding that a plaintiff could recover economic loss damages on a strict liability theory in admiralty. Rodrigues v. Campbell Industries, 87 Cal.App.3d 494, 499, 151 Cal.Rptr. 90, 92 (1978). In Rodrigues, crew members of a fishing vessel sued the manufacturers of the vessel alleging that a defective rudder and component parts forced the vessel to return to shore. The delay deprived the crew of earnings and profits from the catch. The California Court of Appeal concluded that plaintiffs could not state claims for either strict liability or negligence under state law, but noted that the complaint properly stated causes of action for both negligence and strict liability under federal maritime law
 
 
 [6]
 The contrary view was first set forth in Santor v. M. Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965). There, the New Jersey Supreme Court held that the purchaser of a defective carpet could maintain an action against the manufacturer on a strict liability theory even though his loss was purely economic. The court reasoned that because the policy underlying strict liability is that the manufacturer bear the costs of defective products, it should make no difference whether those costs are pure economic losses or personal injuries suffered by the purchaser. Id. at 59, 207 A.2d at 309
 A handful of states have followed the Santor approach. See City of LaCrosse v. Schubert, Schroeder & Assoc., Inc., 72 Wis.2d 38, 240 N.W.2d 124, (1976); Berg v. General Motors Corp., 87 Wash.2d 584, 555 P.2d 818 (1976); Iacono v. Anderson Concrete Corp., 42 Ohio St.2d 88, 326 N.E.2d 267 (1975).
 
 
 [7]
 Seely rests in part on the notion that a purchaser of a defective product has an adequate remedy under warranty law. We believe, however, that the doctrine of strict liability provides better protection against product defects than warranty law and thus better serves the policy enunciated in Carbone v. Unsich, supra, 209 F.2d at 182. A purchaser or consumer is not always protected under warranty law. For instance, a purchaser or consumer can be precluded from recovery if: (1) he did not give timely notice of the breach of warranty to the manufacturer or seller, see U.C.C. Sec. 2-607(1977); or (2) the manufacturer or seller expressly and effectively disclaimed liability for the damages the purchaser or consumer was seeking to recover, see U.C.C. Sec. 2-316 (1977). These limitations do not exist in strict liability
 
 
 [8]
 Commentators have argued that it is difficult for the manufacturer to insure against a purchaser's economic loss. See Note, Economic Loss in Products Liability Jurisprudence, 66 Colum.L.Rev. 917, 955-958 (1966). The contention is that each purchaser has different business opportunities and potential for profit and, therefore, the amount of consequential loss will vary from case to case. Id. Yet, although predicting the amount of consequential damages is not as actuarially precise as determining life expectancy, it is not an impossible task. Indeed, it seems no more difficult than predicting the amount of property damage or personal injury that will be caused by a product defect. The consequences of a personal injury will also vary from case to case because of differences in the severity of the injury and because of differences in earning potentials of the injured parties