**In re the GLACIER BAY.**

No. A88–115 Civ.

United States District Court,
D. Alaska.

July 26, 1991.

**631**

John Treptow, Atkinson, Conway & Gagnon, Anchorage, AK, for plaintiff.

David B. Ruskin, Ferguson, Burdell & Ruskin, Anchorage, AK, for Special Discovery Master.

Michael H. Woodell, Bradbury Bliss & Riordan, Anchorage, AK, for defendant's Liaison Counsel (Except defendant-U.S.).

R. Michael Underhill, Torts Branch, Civ. Div., U.S. Dept. of Justice, San Francisco, CA, for defendant-U.S. Liaison Counsel.

## ORDER

HOLLAND, Chief Judge.

*Motions to Dismiss Economic Losses & Motion for Summary Judgment*

Separate motions to dismiss were filed by Tesoro, by the vessel interest defendants,[1] and by the non-TAPAA defendants.[2] All three motions involve the ability of non-fishermen plaintiffs to recover damages for economic losses. The court distributed draft copies of its order on these motions before hearing oral argument on them. At oral argument, the parties noted that the decisions in these three motions to dismiss needed to be consistent with the decisions on two other pending motions. Those other two motions are 1) Tesoro's motion for summary judgment dismissing the plaintiffs' claims and 2) defendants' joint motion to dismiss fishermen plaintiffs' remote economic claims.

All five motions present difficult issues because of the complex nature of the law applicable to oil spills. In both this case and in the *Exxon Valdez*,[3] the law applicable to each plaintiff's claim is affected by numerous variables, such as the nature of the damage, the size of the claim, and the role each defendant played in the oil spill. Threading one's way through the resulting legal maze is an arduous task, at best. With complex federal litigation, such as the Trans–Alaska Pipeline Authorization Act (TAPAA), 43 U.S.C. §§ 1651–1655, involved here, it is often difficult to divine what Congress intended and still more difficult to implement that intent. In this case, the court is required to simultaneously deal with three parallel bodies of law: general maritime law, federal statutory law (TAPAA), and state law. Subsequently, Congress further complicated the matter by enacting the Trans–Alaska Pipeline System Reform Act of 1990, Pub.L. 101–380, §§ 8001–8302, 104 Stat. 484, 564–573 (1990), which applies retroactively. At times the process is much like a three-dimensional chess game. Where, as here, the federal statutory law (TAPAA) is flawed in that the process it created is ill-conceived to accom-

---

1. Trinidad Corporation (owner of *S/T Glacier Bay*); The West of England Ship Owners Mutual Protection Indemnity Association (Luxembourg) (posted certificate of financial responsibility for damages caused by *Glacier Bay*); Kee Leasing Company (ownership interest); Mathiasen's Tanker Industries, Inc. (bareboat charterer); Glacier Bay Transportation Corporation (sub-bareboat charterer).

2. SPC Shipping, Inc. (time charterer); The Standard Oil Company (SOHIO) (posted certificate of financial responsibility for Trinidad); Tesoro Alaska Petroleum Company (owner of the oil spilled); Cook Inlet Resource Organization (CIRO) (responsible for spill clean up).

3. *In re the Exxon Valdez*, 767 F.Supp. 1509 (D.Alaska 1991).

plish the result that Congress intended, the court's task becomes overwhelming. The process established by TAPAA is most notable for its glaring gaps in detail as to how the process should work. The court is, therefore, left to force a less than perfect fit between three bodies of law, without benefit of guidance from any precedent.

### Tesoro's Motion to Dismiss Plaintiffs' Economic Loss Claims

Defendant Tesoro filed a motion to dismiss plaintiffs' claims against it for economic losses that are not the result of physical impact or injury from oil on the plaintiffs' person or property, pursuant to *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). Plaintiffs opposed the motion on the grounds that this issue has already been decided by the court. Tesoro replied that the ruling in the *Exxon Valdez*,[4] creates an inconsistency with the prior ruling in this case.[5]

Tesoro was the owner of the Trans–Alaska Pipeline System (TAPS) oil which was being transported by the vessel *Glacier Bay* at the time of the spill. Tesoro's motion raises the issue of whether the Alaska Act, AS 46.03.822, conflicts with federal maritime law, as applied to Tesoro. Tesoro argues that TAPAA imposes strict liability on the vessel owner or operator only to the extent of $14 million.[6] For the balance of the damage claims up to $100 million, TAPAA imposes strict liability only on the Trans–Alaska Pipeline Liability Fund (Fund). Unlike the Alaska Act, TAPAA does not impose any strict liability on the owner of TAPS oil.

Previously, the court addressed the issue of whether claims for economic loss are recoverable by fishermen and non-fishermen under the Alaska Act.[7] That issue was raised and decided in the context of Phase I of the Case Management Plan. Phase I focuses on i) which plaintiffs may properly assert claims for compensable damages and ii) which of plaintiffs' damage claims are legally cognizable.[8] Phase II of the Case Management Plan focuses on liability issues as between the various defendants.[9] The ruling in the Phase I Order did not take into consideration issues of defendants' separate liability. While Tesoro's present motion appears to be more appropriate for decision under Phase II, it is necessary to resolve the matter now since the issue of liability for economic loss claims appears to be impeding the settlement process.

The problem created by the Phase I Order stems from the following language:

> There is no basis for determining that maritime law preempts the application of the Alaska Act to TAPS oil spills.... To the extent that Alaska imposes strict liability in excess of $100 million, there is no conflict between TAPAA and the Alaska Act. However, under the grant of authority to the states, it would be inconsistent to impose the *Robins Dry Dock* rule from maritime law on state claims when that rule does not apply to TAPAA claims.
>
> Since the Alaska Act is not preempted by maritime law, the issue is whether the Alaska Act imposes a physical harm requirement for recovery of damages for economic loss.

Phase I Order, 746 F.Supp. at 1387. The court went on to conclude that *Robins Dry Dock* does not limit recoveries under either TAPAA or the Alaska Act. *Id.* at 1388. The language referring to claims in excess of $100 million was unnecessary to the *Glacier Bay* decision and was not the focus of the briefing as it was in the *Exxon Valdez.* In the *Exxon Valdez* damages in excess of $100 million was an issue and, at that point, the problem

---

4. *In re the Exxon Valdez,* 767 F.Supp. 1509 (D.Alaska 1991) (Order No. 38—Alyeska's motion for judgment on the pleadings) (Clerk's Docket No. 1178) (hereinafter referred to as "Order No. 38").

5. Order on Phase I Motions & Motions to Dismiss ("Phase I Order") (Clerk's Docket No. 685), published at 746 F.Supp. 1379.

6. TAPAA § 1653(c)(3).

7. Phase I Order, 746 F.Supp. 1379, 1386.

8. Case Management Plan at 2 (Clerk's Docket No. 269).

9. Case Management Plan at 4.

surfaced which was addressed in Order No. 38.

The parties in *Glacier Bay* had represented to the court that estimated damages did not exceed $100 million. However, in dealing with the *Robins Dry Dock* issue in *Exxon Valdez,* the court was faced with estimated damages far in excess of $100 million and with arguments justifying different treatment of the excess amount. The pertinent portions of the court's decision in *Exxon Valdez* are:

Section 1653(c)(9) contains no language which could be interpreted as relieving the states from the limits imposed by maritime law. It simply states that the field of strict liability is not preempted. Thus the State of Alaska may enact laws in the area of strict liability with its police power so long as they are consistent with other applicable federal law. *See Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 341, 93 S.Ct. 1590, 1600, 36 L.Ed.2d 280 (1973).

Section 1653(c)(9) cannot be read as an implied grant of permission to the states to legislate in derogation of general maritime law even though the TAPAA conference report states as follows:

The States are expressly not precluded from setting higher limits or from legislating in any manner not inconsistent with the provisions of this Act.

H.R.Conf.Rep. No. 624, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Admin.News 2417, 2531. Congress' power to legislate concerning rights and liabilities within the maritime jurisdiction and remedies for their enforcement arises from the Constitution and is nondelegable. *Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 164, 40 S.Ct. 438, 441, 64 L.Ed. 834 (1920) (Amendment to "saving to suitors" clause which preserved state workmen's compensation remedies in cases under admiralty jurisdiction was held ineffective).

The subject [admiralty] was intrusted to it to be dealt with according to its discretion—not for delegation to others. To say that because Congress could have enacted a compensation act applicable to maritime injuries, it could authorize the states to do so as they might desire, is false reasoning. Moreover, such an authorization would inevitably destroy the harmony and uniformity which the Constitution not only contemplated but actually established—it would defeat the very purpose of the grant.

*Id.* Congress may have intended for the states to be able to simply extend the strict liability provisions of TAPAA to higher limits without subjecting those higher limits to *Robins Dry Dock,* but Congress did not specifically do so, nor did it have the authority to grant the states permission to do so. *Robins Dry Dock* applies to limit the damages recoverable under the Alaska Act in excess of the $100 million recoverable under TAPAA.

. . . .

The Alaska Act is technically not preempted by TAPAA to the extent of TAPAA's $100 million liability because the remedy is uniform whether a claim is brought under either the Alaska Act or TAPAA. *Robins Dry Dock* will only apply to those claims under the Alaska Act which exceed TAPAA's $100 million liability. However, in practical application, it would be unworkable to allow strict liability claims for the initial $100 million to proceed under both acts and in both this court and the Superior Court for the State of Alaska. While TAPAA provides a mechanism to gather all the claims and fairly prorate them to meet its $100 million liability limits, the Alaska Act has no such mechanism.

Order No. 38 at 13–14 & 17 (footnote omitted). In retrospect, what the court should have said in *Glacier Bay* was:

It would be inconsistent to impose the *Robins Dry Dock* rule from maritime law on state claims *under the Alaska Act which do not exceed $100 million* when that rule does not apply to TAPAA claims.

Tesoro now argues that the *Robins Dry Dock* rule also applies to Alaska Act claims below $100 million that are asserted against anyone other than the vessel owner or operator. The issue is raised because the Fund's settlement with plaintiffs arguably did not

fully compensate them for their damages and they are now proceeding against the various defendants for the difference. This situation accentuates the difficulties encountered by allowing claims to proceed under both TA-PAA and the Alaska Act, as referred to in *Exxon Valdez*, Order No. 38.

The Alaska Act, which provides for unlimited strict liability for the release of any hazardous substances, as defined in A.S. § 46.03.826(5), is a broader statute than TA-PAA § 1653(c), which provides for limited strict liability in only the specific circumstances of TAPS oil spills. Unlike TAPAA which applies only to the vessel owner and operator and the Fund, the Alaska Act applies to five categories of persons:

Sec. 46.03.822. Strict liability for the release of hazardous substances. (a) Notwithstanding any other provision or rule of law ..., the following persons are strictly liable, jointly and severally, for damages to persons or property, ..., resulting from an unpermitted release of a hazardous substance ...:

(1) the owner of, and the person having control over, the hazardous substance at the time of the release or threatened release; this paragraph does not apply to a consumer product in consumer use;

(2) the owner and the operator of a vessel or facility, from which there is a release, or a threatened release that causes the incurrence of response costs, of a hazardous substance;

(3) any person who at the time of disposal of any hazardous substance owned or operated any facility or vessel at which the hazardous substances were disposed of, ...;

(4) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances ...;

(5) any person who accepts or accepted any hazardous substances, other than refined oil, ....

A.S. § 46.03.822(a). Tesoro is liable under § 46.03.822(a)(1) as the owner of the hazardous substance.[10] The last three categories in the Alaska Act would generally not be involved in oil spills that were subject to TAPAA. None of the five categories of persons liable would include the Fund.

■ Tesoro argues that *Robins Dry Dock* should apply to limit its liability under the Alaska Act because TAPAA, which is not affected by *Robins Dry Dock*, only holds the vessel owner or operator and the Fund liable. Tesoro concludes that since the Fund does not fit under any of the five categories of persons liable under the Alaska Act, only the vessel owner or operator would face liability unrestricted by *Robins Dry Dock*, and then only to the extent of $14 million.

The Fund was established by TAPAA as a "non-profit corporate entity." 43 U.S.C. § 1653(c)(4). While the Fund is administered by the holders of the trans-Alaska pipeline right-of-way, the Fund is financed entirely by the owners of the oil. § 1653(c)(4)–(6). The owner of the oil at the time it is loaded on the vessel is assessed a fee of five cents per barrel, which is collected by the pipeline operator and delivered to the Fund. The assessment stops when $100 million has accumulated in the Fund, but resumes whenever the Fund drops below $100 million. The TAPAA conference report describes the underlying reasoning as follows:

The owners of oil loaded onto tankers at Valdez will pay the Fund five cents per barrel until there is $100 million in the fund. Payments would resume at any time the Fund fell below $100 million. (The Fund is described in more detail under Major Provisions.) Thus, the owners of the oil would have an incentive to select carefully vessels to carry their oil. Moreover, such owners would then share the risk associated with transporting the oil on water.

H.R.Conf.Rep. No. 624, 93rd Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Admin.News 2417, 2531.

---

**10.** A.S. § 46.03.826(5)(B) defines "hazardous substance," for purposes of § 46.03.822, as in-   cluding oil.

A nonprofit corporation, like a business corporation, provides limited liability to its members. 19 Fletcher Cyc. Corp. § 2:17 (Perm.Ed.). A member of a nonprofit corporation cannot be assessed more than his agreed contribution. *Id.* In this case, the Fund actually does not have "members" as such. The holders of the pipeline right-of-way administer the Fund by designating a Board of Trustees. 43 C.F.R. §§ 29.2 & 29.3 (1989). While the Board of Trustees is composed of "members," those members have no financial obligation to the Fund. The oil purchasers, on the other hand, are obligated to pay five cents per barrel to the Fund. Whether the oil owners are "members" of the Fund or not, the limit of their statutory contribution to the Fund is five cents per barrel purchased.

Since Tesoro paid five cents per barrel on all the TAPS oil it purchased, unless the fee was suspended because the Fund had $100 million, Tesoro has no further liability under TAPAA. The five cents per barrel fee paid by all TAPS oil purchasers covers the claims for remote economic losses made against the Fund. If Tesoro were required to pay for remote economic losses under the Alaska Act, Tesoro would be paying for remote economic losses twice. Imposing liability on individual oil owners, as the Alaska Act does, creates a conflict with TAPAA which distributes the liability for remote economic losses among all TAPS oil purchasers and which limits any individual oil purchaser's liability to five cents per barrel. Because of that conflict, the State of Alaska is not authorized to impose unrestricted liability upon an oil owner even though TAPAA allows recovery of damages unrestricted by the rule in *Robins Dry Dock.* Tesoro's entire liability under the Alaska Act is subject to the rule in *Robins Dry Dock.* The fact that the Fund settled with plaintiffs for arguably less than the full amount of plaintiffs' damages does not make Tesoro liable for damages for remote economic losses.

█ Tesoro raises a second issue as to whether the Ninth Circuit's commercial fishermen exception to the *Robins Dry Dock* rule applies to the strictly liable, but non-negligent owner of TAPS oil. The Ninth Circuit has created a limited exception to the rule in *Robins Dry Dock* for commercial fishermen to recover purely economic losses. *Carbone v. Ursich,* 209 F.2d 178, 181–182 (9th Cir.1953) (hold that crew members of fishing vessel could recover lost profits from owners of another vessel that negligently fouled fishing nets, even though crew members did not own the nets); *Union Oil Co. v. Oppen,* 501 F.2d 558, 570 (9th Cir.1974) (held that commercial fishermen whose harvests were depleted by an oil spill could recover lost profits from oil company responsible for offshore drilling). The commercial fishermen exception is recognized under the general maritime law of negligence. *Jones v. Bender Welding & Machine Works, Inc.,* 581 F.2d 1331, 1337 (9th Cir.1978). The Ninth Circuit only applied the exception in one strict liability case, *Emerson G.M. Diesel, Inc. v. Alaskan Enterprise,* 732 F.2d 1468 (9th Cir.1984).

*Emerson* held that a commercial fishing vessel could recover damages for purely economic losses in a strict products liability admiralty action. In 1986, however, the Supreme Court ruled otherwise in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 876, 106 S.Ct. 2295, 2304, 90 L.Ed.2d 865 (1986): "Thus, whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss." Tesoro concluded from the foregoing that the commercial fishermen exception was not applicable to strict liability imposed on a non-negligent oil owner.

The decision in *East River* was reached because claims for purely economic losses in a products liability claim are more in the nature of a warranty claim and subject to the Uniform Commercial Code. Products liability is not the issue here. The Ninth Circuit's exception for commercial fishermen is based on "the familiar principle that seamen are the favorites of admiralty and their economic interests entitled to the fullest possible legal protection." *Carbone,* 209 F.2d at 182. It makes no sense to allow the exception to apply in negligence actions but not in those brought under strict liability where a statute

has pursued societal goals by fixing responsibility.

Under the Alaska Act, the entire liability of the oil owner is subject to the rule in *Robins Dry Dock,* as it is modified by the Ninth Circuit's limited exception for commercial fishermen. Tesoro's motion to dismiss plaintiffs' economic loss claims is granted as to non-fishermen plaintiffs; it is denied as to fishermen plaintiffs.

### *Vessel Interest Defendants' Motion to Dismiss Non-fishermen Plaintiffs' State Law Claims for Economic Losses*

The vessel interest defendants filed a motion to dismiss all non-fishermen plaintiffs'[11] state law claims for economic losses. Plaintiffs filed a joint opposition to this motion and the motion to dismiss filed by the non-TAPAA defendants. The vessel interest defendants replied to the opposition. After the draft copies of this order were distributed, the Fund filed a memorandum[12] and Steven Schroer, attorney for plaintiffs, filed an affidavit.[13]

The vessel interest defendants argue that since they have already paid their $14 million of strict liability under TAPAA,[14] *Robins Dry Dock* requires dismissal of plaintiffs' remaining state law claims for economic losses filed against the vessel interest defendants. The vessel interest defendants base their argument on this court's ruling in the *Exxon Valdez:*

> The Alaska Act is technically not preempted by TAPAA to the extent of TAPAA's $100 million liability because the remedy is uniform whether a claim is brought under either the Alaska Act or TAPAA. *Robins Dry Dock* will only apply

to those claims under the Alaska Act which exceed TAPAA's $100 million liability. Order No. 38 at 17.

The issue raised by the motion is whether the *Robins Dry Dock* rule of maritime law, which bars recovery for economic losses that are not the result of physical injury to person or property, applies to state law claims remaining after a vessel owner has satisfied its $14 million TAPAA liability. TAPAA imposes strict liability "[n]otwithstanding the provisions of any other law"[15] on the vessel owner and operator to the extent of $14 million and on the Fund to the extent of $86 million.[16] Through successful settlement negotiations, the Fund has been released from its liability to these plaintiffs. Apparently, plaintiffs do not accept the Fund's determination as to the value of their claims as adequate compensation. Rather than proceeding through the Fund determination appeal process in this court, plaintiffs have chosen to pursue their state strict liability claims under the Alaska Act and common state law theories of negligence and abnormally dangerous activities[17] in order to recover the rest of their damages.

■ The court's language in the *Exxon Valdez* Order No. 38 should not be read to suggest that plaintiffs have a $100 million remedy under TAPAA plus a $100 million remedy under the Alaska Act. The remedy is for $100 million total whether plaintiffs proceed under TAPAA or the Alaska Act or both. Neither was the language in Order No. 38 meant to indicate that all state law was free from the restrictions of maritime law, so long as the total TAPAA oil spill damages did not exceed $100 million. Only the strict liability imposed by the Alaska Act

---

11. Fish processor plaintiffs: Allied Processing, Inc.; John Cabot Company, Inc.; Dragnet Fisheries, Inc.; Ed's of Kasilof Seafoods; Keener Packing, Inc.; Inlet Fisheries, Inc.; Royal Pacific Fisheries, Inc.; Salamatof Seafoods, Inc.; Cook Inlet Processing, Inc.; and Icicle Seafoods.
   Fish marketing/trader plaintiffs: Seasonal Seafoods, Inc.; and Al McNamara, d/b/a Northland Fresh.

12. Memorandum of the Trans–Alaska Pipeline Liability Fund Regarding the Court's Order Dated June 27, 1991 (Clerk's Docket No. 905).

13. Clerk's Docket No. 907.

14. *See* affidavit of Michael Woodell (Clerk's Docket No. 785).

15. 43 U.S.C. § 1653(c)(1).

16. 43 U.S.C. § 1653(c)(3).

17. Second Consolidated Complaint, Count III (Alaska Act), Count IV (abnormally dangerous activity), and Count V (negligence) (Clerk's Docket No. 375).

is unaffected by *Robins Dry Dock*, and then only to the extent of $100 million. If payments of less than $100 million were made under TAPAA, the Alaska Act would only be unaffected by *Robins Dry Dock* for the difference between the TAPAA payments and $100 million total damages. If the full $100 million available under TAPAA was paid out, all damages claimed under the Alaska Act would be subject to *Robins Dry Dock*. Order No. 38 did not attempt to determine which, if any defendants, would face unrestricted liability under the Alaska Act.

The $100 million strict liability "[n]otwithstanding the provisions of any other law" imposed by TAPAA does not create a $100 million window of opportunity for states to legislate as they wish regarding TAPAA oil spills, unrestricted by other maritime law. States can impose strict liability unrestricted by *Robins Dry Dock* only to the extent that the state law does not conflict with TAPAA. The Alaska Act is broader than TAPAA. It imposes strict liability on spills of substances other than TAPS oil. It holds liable categories of people who are not liable under TAPAA. The Alaska Act is unrestricted by *Robins Dry Dock* only to the extent that it involves a spill of TAPS oil and only as applied to those persons who are strictly liable under TAPAA. Any other conclusion creates a conflict both with TAPAA and with other maritime law.

The question presently before the court is to what dollar amount are persons who are liable under TAPAA also liable under the Alaska Act. Plaintiffs' position is that the vessel interest defendants are liable for a full $100 million even though TAPAA imposed only $14 million of strict liability on them. Plaintiffs' position is not correct.

TAPAA limits the strict liability "[n]otwithstanding the provisions of any other law" imposed on the vessel owner and operator to $14 million.[18] Of the $100 million of strict liability unrestricted by *Robins Dry Dock*

which is provided by TAPAA or the Alaska Act, the vessel interest defendants are liable for a total of $14 million. Damages claimed against the vessel interest defendants under either TAPAA or the Alaska Act in excess of $14 million are subject to the application of *Robins Dry Dock*.

Plaintiffs' reliance on *Steuart Transportation Co. v. Allied Towing Corp.*, 596 F.2d 609 (4th Cir.1979), is misplaced. *Steuart* held "that the [Federal Water Pollution Control Act] does not prevent us from giving full effect to the Virginia oil pollution statute." *Id.* at 620. This court has already ruled that TAPAA does not preempt the Alaska Act. Phase I Order, 746 F.Supp. 1379, 1387. *Steuart* does not address whether *other* maritime law such as the rule in *Robins Dry Dock*, affects a state oil pollution statute. Limited relief from *Robins Dry Dock* occurs in this case only because TAPAA grants relief from it and TAPAA overlaps with the Alaska Act to provide the same remedy. Maritime law, not TAPAA, is what is preventing the court from giving full effect to the Alaska Act.

Through the affidavit of Steven Schroer the plaintiffs dispute the affidavit of Michael Woodell which states that the vessel interest defendants have paid damages in excess of their $14 million TAPAA liability. Accounting for the payment of the vessel interest defendants' $14 million TAPAA liability is not the issue raised by this motion. To the extent that the vessel interest defendants have not paid $14 million in qualified claims, the non-fishermen plaintiffs' state law claims are not dismissed.[19]

However, to the extent that the vessel interest defendants have paid their $14 million TAPAA liability and because plaintiffs do not allege anything but damages for economic losses for those plaintiffs targeted by this motion,[20] the motion to dismiss non-fishermen plaintiffs' state law claims for economic losses is granted.

---

**18.** 43 U.S.C. § 1653(c)(1) & (3).

**19.** Plaintiffs subsequently agreed that the vessel interest defendants have paid $14 million in settlement of claims compensable under TAPAA. Plaintiffs' and Vessel Interest Defendants' Joint Notice Re Vessel Interest Defendants' Payment of

$14 Million (July 23, 1991) (Clerk's Docket No. 912).

**20.** Second Consolidated Complaint, paragraphs 704–705 (Clerk's Docket No. 375).

*Non–TAPAA Defendants' Motion to Dismiss Non-fishermen Plaintiffs' State Law Claims for Economic Losses*

The non-TAPAA defendants filed a joint motion to dismiss the non-fishermen plaintiffs'[21] claims for economic losses. Plaintiffs filed an opposition memorandum which addressed both this motion and the vessel interest defendants' motion to dismiss. The non-TAPAA defendants replied to plaintiffs' opposition.

Plaintiffs have settled with the Fund for less than what plaintiffs' believe to be full compensation under TAPAA. Plaintiffs are now seeking to recover the difference under state law claims for negligence, abnormally dangerous activities, and strict liability under the Alaska Act.[22]

TAPAA imposes $100 million of strict liability on the vessel owner and operator and on the Fund for spills of TAPS oil. The defendants bringing this motion have designated themselves as the "non-TAPAA defendants" because they are not the vessel owner or operator or the Fund.[23] The non-TAPAA defendants argue that since the plaintiffs have settled all of their TAPAA claims with the Fund, TAPAA no longer has any preemptive effect on maritime law such as the rule of *Robins Dry Dock*. In addition, the non-TAPAA defendants argue that TAPAA is irrelevant to plaintiffs' claims against them and cannot be bootstrapped into a force controlling the remaining non-TAPAA claims.

Plaintiffs' position is that the defendants may be held strictly liable under the Alaska Act for the non-fishermen plaintiffs' economic losses without evidence of physical harm to the extent of $100 million.

Defendants are incorrect in their conclusion that settlement of the TAPAA claims terminates the effect of TAPAA, but are correct in their argument that TAPAA and its effects are irrelevant as to claims against them. The strict liability imposed by the Alaska Act does not conflict with maritime law to the extent of TAPAA liability for $100 million. The strict liability for $100 million under TAPAA, not the actual payment of damages by the Fund, is what negates the application of *Robins Dry Dock* to the Alaska Act. *Robins Dry Dock* does not apply to strict liability for TAPS oil spills until the total damages under both TAPAA and the Alaska Act exceed $100 million.

As was discussed in the orders on the vessel interest defendants' and Tesoro's motions to dismiss, the Alaska Act is unrestricted by *Robins Dry Dock* only to the extent that it is applied to persons who are strictly liable under TAPAA. Those people strictly liable under TAPAA are the vessel owner and operator, and the Fund. The non-TAPAA defendants bringing this motion do not have any TAPAA liability.

Plaintiffs did not allege anything but damages for economic losses for those plaintiffs targeted by this motion.[24] Therefore, the motion is granted.

*Tesoro's Motion for Summary Judgment Dismissing the Plaintiffs' Claims*

Tesoro filed a motion for summary judgment dismissing all of the plaintiffs' claims against it. The basis for the motion is that plaintiffs have received payment of their claims from the Fund and, therefore, no longer have causes of action against Tesoro. CIRO, SPC and SOHIO subsequently joined in Tesoro's motion. Plaintiffs opposed the motion. Tesoro replied to plaintiffs' opposition, as did SOHIO and SPC.

The defendants essentially make several arguments: 1) that plaintiffs' claims were assigned to the Fund as a result of the

---

**21.** Fish processor plaintiffs: Allied Processing, Inc.; John Cabot Company, Inc.; Dragnet Fisheries, Inc.; Ed's of Kasilof Seafoods; Keener Packing, Inc.; Inlet Fisheries, Inc.; Royal Pacific Fisheries, Inc.; Salamatof Seafoods, Inc.; D & G Enterprises and Cook Inlet Processing, Inc.

Fish marketing/trader plaintiffs: Season Seafoods, Inc. and Al McNamara, d/b/a Northland Fresh.

**22.** Second Consolidated Complaint, Counts III, IV & V (Clerk's Docket No. 375).

**23.** Tesoro, the owner of the oil spilled, filed another motion to dismiss in addition to this one.

**24.** Second Consolidated Complaint, paragraphs 704–705 (Clerk's Docket No. 375).

settlements reached, 2) that plaintiffs' release of the Fund from further liability breached the Case Management Plan Stipulation ("CMPS"),[25] and 3) that plaintiffs' state law claims are inconsistent with general maritime law.

■ The plaintiffs do not dispute that they have settled with the Fund and that they are no longer pursuing claims under TAPAA. TAPAA does provide for subrogation of claims to the Fund:

> (8) In any case where liability without regard to fault is imposed pursuant to this subsection *and the damages involved were caused by the unseaworthiness of the vessel or by negligence,* the owner and operator of the vessel, and the Fund, as the case may be shall be subrogated under applicable State and Federal laws to the rights under said laws of any person entitled to recovery hereunder....

43 U.S.C. § 1653(c)(8) (emphasis added). The implementing regulation is 43 C.F.R. § 29.10, which states:

> If the Fund pays compensation to any claimant, the Fund shall be subrogated to all rights, claims, and causes of action which that claimant has to the extent permitted by law.

Apparently the Fund reads that regulation to require subrogation whenever a claim is paid by the Fund. The Fund's interpretation of the regulation is inconsistent with the statute. Section 1653(c)(8) provides for subrogation in those situations where both liability is imposed under TAPAA *and* damages were caused either by unseaworthiness of the vessel or by negligence. While there are numerous allegations of negligence in this case, no determination has yet been made to that effect, nor will any be made until Phase II of the litigation.

Subrogation is one of those areas where the TAPAA procedure fails to take into account the complications caused by state legislation, which was encouraged by TAPAA § 1653(c)(9), and by existing maritime law. The Fund's interpretation of the subrogation provided for in TAPAA § 1653(c)(8) and in 43 C.F.R. § 29.10 assumes that the Fund will compensate the claimants to their satisfaction and that state or federal law will not provide additional remedies. That is not the situation here. Even if the plaintiffs had pursued the Fund determinations through the appeal process, they still might not have been satisfied with the final determination and they still might have wanted to pursue their remedies under other law.

In approving the settlements reached with the Fund, this court said:

> The court recognizes that if it should develop that the Tesoro defendants' only exposure in Phase I is for state law strict liability (AS 46.03.822), then there is the possibility of these defendants being held liable for a portion of the plaintiffs' claims which could have been paid by the Fund and were not. In these circumstances, the Fund would have been unable to pass the loss on to other defendants, for we here assume that the Tesoro defendants are strictly liable and not liable for unseaworthiness of a vessel or negligence. The Tesoro defendants would in this event pay more than they might otherwise have had to pay. The fallacy of the argument lies in the fact that TAPAA imposes on the Fund the job of adjudicating the claims as *it* evaluates them, not as the plaintiffs do. If, as is proposed, the plaintiffs will accept the Fund's evaluation, they should be permitted to do so. Implicit in the foregoing is the court's conclusion that plaintiffs could have waived their rights against the Fund and could have pursued only the remaining defendants, including the Tesoro defendants. TAPAA is not an exclusive remedy. 43 U.S.C. § 1653(c)(9).

Both the Fund and the Tesoro defendants are named defendants in this case. Plaintiffs' claims against each of the defendants must stand or fall on the merits of such claims under the law applicable to each defendant. The Tesoro defendants cite no authority, and the court knows of none, for the proposition that plaintiffs should not be permitted to elect when, how, and in what amount they settle with one of several defendants who are jointly

**25.** Clerk's Docket No. 268 (Dec. 1, 1989).

liable for plaintiffs' damages. Because of the potentially separate legal basis for claims by plaintiffs against the Tesoro defendants, the latter have no legal standing to complain that plaintiffs may be settling with the Fund for less than the plaintiffs might prove at trial. The law simply does not require that the Fund accept the risk of paying more when it can settle for less.

As discussed above, the Fund has the possibility of subrogation rights over against one or more of its co-defendants. The Fund is subrogated to the plaintiffs' claims to the extent of its payments; and, while the Fund is solely liable for losses due, for example, to acts of God, it may recover on its subrogation rights against other defendants who are determined to have been the operator of an unseaworthy vessel or who are determined to have acted negligently. 43 U.S.C. § 1653(c)(8). The Fund's subrogation rights have existed from the outset of this litigation and, of course, the lower plaintiffs' settlements with the Fund, the less (not more) it will have in the way of subrogation rights over against the co-defendants such as the Tesoro defendants.

Order on Joint Motions for Approval of Settlements With Fund at 5–7 (Feb. 20, 1991).[26] Because of flaws in the Fund's procedure, the court was forced to determine that plaintiffs subrogated their rights to the Fund only to the extent that plaintiffs received payment from the Fund. How the Fund can pursue those limited subrogated rights is an issue not presently before the court.

■ Defendants second argument is that plaintiffs no longer have claims against SPC, SOHIO, CIRO and Tesoro because plaintiffs' settlement with the Fund was a material breach of the CMPS. Defendants contend that the most critical element of the CMPS was the funding scheme set up to provide payment of plaintiffs' claims. Defendants argue that an essential element of the concessions made by all parties was the promise and the anticipation that the Fund would make $86 million available to fund any judgments plaintiffs might receive. Defendants claim that the only possible remedy is to declare that the plaintiffs have released the other parties to the CMPS.

Defendants made this same argument in their joint opposition to the joint motion of plaintiffs and the Fund for approval of the settlement.[27] The court was not persuaded. Tesoro subsequently filed a motion to reconsider. The motion was denied.[28] The court views the CMPS as a procedural agreement and not as a contract affecting substantive rights. Perhaps there has been a misunderstanding as to whether the Fund agreed to contribute the full $86 million of its liability, but the remedy would not be to dismiss the plaintiffs.

■ Defendants third argument is that plaintiffs' claims under the Alaska Act are inconsistent with the general maritime law. Defendants acknowledge that this court has ruled that TAPAA allowed the states to establish strict liability rules in the context of TAPS oil spills.[29] However, defendants interpret that ruling to only apply so long as TAPAA claims exist in the case. Where the TAPAA claims have settled, as in this case, defendants contend that general maritime law, not state law, is all that applies.

Defendants have misconstrued the ruling in Order No. 38. The enactment of TAPAA, independent of any particular plaintiffs' claims under it, changed maritime law in such a way that the present Alaska Act is not inconsistent with maritime law, within the limitations discussed in this order. The fact that plaintiffs have settled their TAPAA claims does not suddenly throw the Alaska Act into conflict with maritime law.

Tesoro's motion for summary judgment dismissing the plaintiffs' claims is denied.

*Defendants' Joint Motion to Dismiss Fishermen Plaintiffs' Remote Economic Claims*

The defendants filed a joint motion to dismiss the remaining fishermen plaintiffs'

---

**26.** Clerk's Docket No. 760.

**27.** Clerk's Docket No. 725.

**28.** Clerk's Docket No. 784.

**29.** Order No. 38.

claims for economic losses which are unaccompanied by claims for physical harm. The basis for defendants' motion is the argument that the Ninth Circuit's commercial fishermen exception from the *Robins Dry Dock* rule is no longer viable after the decision in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Plaintiffs opposed the motion. Defendants replied to plaintiffs' opposition.

In the *Exxon Valdez* Order No. 38, this court certified the issue of the Ninth Circuit's commercial fishermen exception for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Ninth Circuit declined to take the appeal. The reason this court certified the issue was the language in *East River*:

> Exercising traditional discretion in admiralty, [citation omitted], we adopt an approach similar to *Seely* [*v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145] and hold that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself. [footnote 6]

> [footnote 6] We do not reach the issue whether a tort cause of action can ever be stated in admiralty when the only damages sought are economic. Cf. *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931). But see *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927).

*East River*, 476 U.S. at 871, 106 S.Ct. at 2302.

Defendants identify the issue in this motion as follows: after the plaintiff fishermen's settlement of all their TAPAA claims and the complete release of the Fund, should the remaining unsettled plaintiff fishermen's economic loss claims be dismissed? Defendants request this court to rule that, after the decision in *East River* and the plaintiff fishermen's discharge of TAPAA claims, the remaining commercial fishermen's economic loss claims are not recoverable, absent physical damage.

Under *Carbone v. Ursich*, 209 F.2d 178 (9th Cir.1953), and *Union Oil Co. v. Oppen*, 501 F.2d 558 (9th Cir.1974), commercial fishermen's economic loss claims are recoverable regardless of whether there is physical damage to person or property. The court is not prepared to rule that the Ninth Circuit commercial fishermen exception to the *Robins Dry Dock* rule is no longer the law in this circuit. The decision in *East River* dealt only with products liability. In fact, the Supreme Court specifically noted that fishermen were not involved in *East River*:

> The courts adopting this approach, including the majority of the Courts of Appeals sitting in admiralty that have considered the issue, [footnote 5] *e.g., Emerson G.M. Diesel, Inc. v. Alaskan Enterprise*, 732 F.2d 1468 (CA9 1984), find that the safety and insurance rationales behind strict liability apply equally where the losses are purely economic.

> [footnote 5] Most of the admiralty cases concerned fishing vessels. See *Emerson G.M. Diesel, Inc. v. Alaskan Enterprise*, 732 F.2d 1468, 1477 (CA9 1984) (relying on solicitude for fishermen as a reason for a more protective approach). Delaval concedes that the courts, see *Carbone v. Ursich*, 209 F.2d 178, 182 (CA9 1953), and Congress, see 46 U.S.C.App. § 533 (1982 ed., Supp. II), at times have provided special protection for fishermen. This case involves no fishermen.

*East River*, 476 U.S. at 869, 106 S.Ct. at 2301.

Defendants' joint motion to dismiss fishermen plaintiffs' remote economic claims is denied.